## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | |
|---|---|
| BUFFALO PATENTS, LLC, | CIVIL ACTION NO. 4:22-cv-495 |
| Plaintiff, | ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT |
| v. | **JURY TRIAL DEMANDED** |
| NESTLÉ S.A., SOCIÉTÉ DES PRODUITS NESTLÉ S.A., NESTLE USA, INC., NESTLÉ NESPRESSO S.A., and NESPRESSO USA, INC., | |
| Defendants. | |

### ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Buffalo Patents, LLC ("Buffalo Patents" or "Plaintiff") files this original complaint against Defendants Nestlé S.A., Société des Produits Nestlé S.A., Nestle USA, Inc., Nestlé Nespresso S.A., and Nespresso USA, Inc. (collectively, "Nestlé" or "Defendants"), alleging, based on its own knowledge as to itself and its own actions and based on information and belief as to all other matters, as follows:

### PARTIES

1.      Buffalo Patents is a limited liability company formed under the laws of the State of Texas, with its principal place of business at 1200 Silver Hill Dr., Austin, Texas, 78746.

2.      Defendant Nestlé S.A. is a Swiss company with a place of business at 55 Avenue Nestlé, 1800 Vevey, Switzerland.  Nestlé S.A. may be served with process by serving the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701, as its agent for service because it engages in business in Texas but has not designated or maintained a resident agent for service of process in Texas as required by statute.  This action arises out of that business.

3.      Nestlé S.A., together with its subsidiaries, is a global food and drink company with "more than 2000 brands ranging from global icons to local favorites, and are present in 186 countries worldwide."[1]  As the world's largest coffee buyer, Nestlé offers "three of the world's most iconic coffee brands – Nescafé, Nespresso, and Starbucks," and states that "innovation is at the core of everything we do."[2]  Nestlé's Nespresso machines "allow everyone to create barista-quality coffee at home."[3]

4.      Defendant Société des Produits Nestlé S.A. ("SPN") is a Swiss company with a place of business at 55 Avenue Nestlé, 1800 Vevey, Switzerland.  SPN may be served with process by serving the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701, as its agent for service because it engages in business in Texas but has not designated or maintained a resident agent for service of process in Texas as required by statute.  This action arises out of that business.

5.      SPN, a wholly owned subsidiary of Nestlé S.A., is involved in the research and technological development of Nestlé products, including the products marketed under the Nespresso brand.  Nestlé corporate documents indicate that SPN is "responsible for all scientific research and technological development, which it undertakes itself or through affiliated companies."[4]

6.      Defendant Nestle USA, Inc. ("Nestle USA") is a corporation organized and existing under the laws of the State of Delaware.  Nestle USA may be served with process

---

[1] *See* www.nestle.com/aboutus.

[2] *See* www.nestle.com/brands/coffee-new.

[3] *See* www.nestle.com/brands/coffee/nespresso.

[4] *See* Consolidated Financial Statements of the Nestlé Group, at 169 (2021), www.nestle.com/sites/default/files/2022-03/2021-corp-governance-compensation-financial-statements-en.pdf.

through its registered agent, CT Corporation System, at 1999 Bryan St., Suite 900, Dallas, Texas, 75201.

7.      Nestle USA, an indirect subsidiary of Nestlé S.A., offers multiple Nestle coffee brands in the United States, including Nescafé, Nespresso, Starbucks at Home, Coffee mate, etc.:



**Source:** www.nestleusa.com/brands/coffee

8.      Defendant Nestlé Nespresso S.A. ("Nespresso") is a Swiss corporation with a place of business at Avenue d'Ouchy 4-6, 1006 Lausanne, Switzerland.  Nespresso may be served with process by serving the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701, as its agent for service because it engages in business in Texas but has not designated or maintained a resident agent for service of process in Texas as required by statute.  This action arises out of that business.

9.      Nespresso, an indirect subsidiary of Nestlé S.A., specializes in developing coffee machines and offering related services.[5]  Nespresso describes itself as having "developed a range of exceptional coffees, machines and services tailored to every preference, and developed to meet the strictest quality standards.  Nespresso offers "a range of convenient and revolutionary

---

[5] *See* https://nestle-nespresso.com/about_us/who_we_are.

coffee systems that consistently deliver the perfect cup of coffee."[6]  Nespresso is "present in 81 countries around the world, with a network of 802 boutiques in 515 cities."[7]

10.     Defendant Nespresso USA, Inc. ("Nespresso USA") is a corporation organized and existing under the laws of the State of Delaware.  Nespresso USA may be served with process through its registered agent, CT Corporation System, at 1999 Bryan St., Suite 900, Dallas, Texas, 75201.

11.     Nespresso USA, an indirect subsidiary of Nestlé S.A., provides Nespresso brand coffee machines and related services in the United States.  Through its website (www.nespresso.com/us/en), Nespresso USA offers Nespresso coffee machines to regular customers and businesses, as well as the corresponding coffee capsules.

12.     The Defendants named above are companies that together comprise the "world's largest food and beverage company."[8]  Nestlé and its subsidiaries (e.g., "the Group") own multiple brands, including the Nespresso coffee brand.

13.     The Defendants named above are part of the same corporate structure and distribution chain for the making, importing, offering to sell, selling, and using of the accused devices in the United States, including in the State of Texas generally and this judicial district in particular.

14.     The Defendants named above share the same management, common ownership, advertising platforms, facilities, distribution chains and platforms, and accused product lines and products involving related technologies.

---

[6] *Id*.

[7] *See* https://nestle-nespresso.com/about_us/our_presence.

[8] *See* www.nestle.com/aboutus.

15.     Thus, the Defendants named above operate as a unitary business venture and are jointly and severally liable for the acts of patent infringement alleged herein.

16.     The parties to this action are properly joined under 35 U.S.C. § 299 because the right to relief asserted against defendants jointly and severally arises out of the same series of transactions or occurrences relating to the making and using of the same products or processes. Additionally, questions of fact common to all defendants will arise in this action.

## JURISDICTION AND VENUE

17.     This is an action for infringement of United States patents arising under 35 U.S.C. §§ 271, 281, and 284–85, among others. This Court has subject matter jurisdiction of the action under 28 U.S.C. § 1331 and § 1338(a).

18.     This Court has personal jurisdiction over the Nestlé Defendants pursuant to due process and/or the Texas Long Arm Statute because, *inter alia*, (i) Nestlé has done and continues to do business in Texas; and (ii) Nestlé has committed and continues to commit acts of patent infringement in the State of Texas, including making, using, offering to sell, and/or selling accused products in Texas, and/or importing accused products into Texas, including by Internet sales and/or sales via local sales personnel and/or through the use of dispensing machines within businesses, and/or committing at least a portion of any other infringements alleged herein in Texas, and (iii) Nestlé regularly places its products within the stream of commerce—directly, through subsidiaries, or through third parties—with the expectation and knowledge that such products will be shipped to, sold, or used in Texas and elsewhere in the United States.  Thus, the Nestlé Defendants have established minimum contacts within Texas and purposefully availed themselves of the benefits of Texas, and the exercise of personal jurisdiction over the Nestlé Defendants would not offend traditional notions of fair play and substantial justice.  In addition,

or in the alternative, this Court has personal jurisdiction over Defendants pursuant to Federal Rule of Civil Procedure 4(k)(2).

19.     Venue is proper as to Defendants Nestlé S.N., SPN, and Nespresso, which are organized under the laws of foreign jurisdictions.  28 U.S.C. § 1391(c)(3) provides that "a defendant not resident in the United States may be sued in any judicial district, and the joinder of such a defendant shall be disregarded in determining where the action may be brought with respect to other defendants").  *See also In re HTC Corp.*, 889 F.3d 1349 (Fed. Cir. 2018).

20.     Venue is proper as to Nestle USA and Nespresso USA pursuant to 28 U.S.C. § 1400(b).  Venue is further proper because (i) Nestle USA and Nespresso USA have committed and continue to commit acts of patent infringement in this district, including making, using, offering to sell, and/or selling accused products in this district, and/or importing accused products into this district, including by Internet sales and/or sales via local sales personnel and/or through the use of dispensing machines within businesses, inducing others to commit acts of patent infringement in this district, and/or committing at least a portion of any other infringements alleged herein in this district.

21.     Further, Nestle USA and Nespresso USA have regular and established places of business in this district, including at least at the following locations: (1) 2601 Preston Rd, No. 5538, Frisco, Texas, 75034, and (2) 3620 The Star Blvd, No. 1200, Frisco, Texas, 75034.

## BACKGROUND

22.     The patent-in-suit generally relates to wireless communication systems that allow users to communicate and connect with devices offering services, such as vending machines or other service providers.  As one example, the patented technology can be used to automatically access remote services, such as a drink dispensing machine, through a smartphone app.

23.     The technology disclosed by the patent-in-suit was developed by engineers at the company, Marconi Commerce Systems, which—prior to 1999—was the British engineering company, GEC (General Electric Company plc), and before that, Gilbarco—a company founded in 1870.  Gilbarco (d/b/a Gilbarco Veeder-Root) has been known as a supplier of fuel dispensers, point of sales systems, and payment systems.  The named inventor, Mr. Carapelli, has extensive experience in innovation, including in mobile payment systems, wireless communication, fuel dispensers, automation solutions, etc.  He has been granted over 150 patents in various fields.

24.     The invention disclosed in the patent-in-suit has been cited during patent prosecution multiple times by electronics companies, including Dell, ExxonMobil (Research & Engineering division), Intermec (acquired by Honeywell), Novatel Wireless, and Toshiba.

## COUNT I

## DIRECT INFRINGEMENT OF U.S. PATENT NO. 7,664,885

25.     On February 16, 2010, United States Patent No. 7,664,885 ("the '885 Patent") was duly and legally issued by the United States Patent and Trademark Office for an invention entitled "Communication System with Automatic Configuration of the Communication Interface."

26.     Buffalo Patents is the owner of the '885 Patent, with all substantive rights in and to that patent, including the sole and exclusive right to prosecute this action and enforce the '885 Patent against infringers, and to collect damages for all relevant times.

27.     Nestlé made, had made, used, imported, provided, supplied, distributed, sold, and/or offered for sale products and/or systems including, for example, the Nespresso Momento 100 Coffee Machine and other products that provide a touchless solution for coffee makers ("accused products"):





**Source:** www.nespresso.com/pro/ch/en/order/machines/pro/momento-100-coffee-machine-nespresso-pro

28.    By doing so, Nestlé has directly infringed (literally and/or under the doctrine of equivalents) at least Claim 14 of the '885 Patent.  Nestlé's infringement in this regard is ongoing.

29.    The Nespresso Momento 100 Coffee Machine is an exemplary accused product.

30.    Nestlé has infringed the '885 Patent by using the accused products and thereby practicing a method for providing wireless communications services, which comprises the step of automatically establishing at a Master unit a wireless bi-directional communications connection between the Master unit and an external Client unit.

31.    For example, the Nespresso Momento 100 Coffee Machine ("Master unit") provides a touchless coffee pouring solution for users with a smart device, like a smartphone ("external Client unit").  A touchless coffee pouring feature allows users to select a desired type of coffee and control its pouring into a cup via a smartphone.  The Momento 100 Coffee Machine has a capacity of 400 capsules and four varieties of coffee.  It includes a QR code that can be used to connect the smartphone to the machine.  When the user scans the QR code, a

wireless connection is automatically established between the Momento 100 Coffee Machine and the user's smartphone via the internet ("wireless bi-directional communications connection"). The user will be redirected to a Momento web application interface after wirelessly connecting the smartphone to the machine.

IN A FEW STEPS TO SAFE
COFFEE ENJOYMENT

Discover our new Touchless function for all Nespresso Momento machines. This smart solution ensures safe coffee preparation at all times for your employees and guests. Completely without touching the coffee machine.

**Source:** https://www.nespresso.com/pro/de/en/momento-touchless



REMOTE CONTROL

With **Remote Control**, your team and guests can now enjoy their favorite coffee recipes without ever touching the machine. The entire brewing process can be done remotely with their phone by scanning a QR code on the machine, providing a more hygienic and personalized coffee experience.

**Source:** https://www.nespresso.com/shared_res/mos/free_html/us/b2b/momento-touchless/momento-touchless-features.pdf



**Source:**

https://www.nespresso.com/ecom/medias/sys_master/public/13883831418910/Nespresso-Momento-Touchless-OR-Code-Mobile-Brewing.pdf



**Source:**

https://www.nespresso.com/ecom/medias/sys_master/public/14492859826206/Nespresso-Momento-Coffee-Milk-Contactless-Usage-Instructions.pdf

**Telemetry**

The machine can be connected to internet. This allows bi-directional communication with the machine, which enables the following benefits:

- Visualize machine coffee consumption and health status
- Update machine options
- Receive additional **Nespresso** services

**Source:**

https://www.nespresso.com/ecom/medias/sys_master/public/13652745584670/Momento-100-EN-AU-S.pdf (Page 34)

**Telemetry Specifications***
**Modem frequency bands:**
- 2G bands (GSM/EDGE): 850, 900, 1800 and 1900 MHz
- 3G bands (UMTS): 800, 850, 900, 1900 and 2100 MHz

**Source:**

https://www.nespresso.com/ecom/medias/sys_master/public/14233654165534/Momento-120-UM-EN-IEC-print-2020-12-18.pdf

32.     The method practiced using the accused products further comprises the step of receiving at the Master unit, using the wireless bi-directional communications connection, a request for a service from the external Client unit.

33.     For example, the Nespresso Momento 100 Coffee Machine provides different types of coffee drinks to its users, such as Espressos, Americanos, Cappuccinos, etc.  The Momento 100 Coffee Machine can display a QR code.  When a user scans that QR code, a wireless connection is automatically established between the Momento 100 Coffee Machine and the user's smartphone via the internet ("wireless bi-directional communications connection").  Once connected, the interface of the Momento 100 Coffee Machine is displayed on the user's smartphone as a web application interface.  The web interface displays different types of coffee

drinks available at the machine ("Master unit").  Users can wirelessly select ("request") a type of

coffee drink from the available options ("service"), such as an Espresso, Americano,

Cappuccino, etc., using the smartphone ("external Client unit").



**Source:** https://www.nespresso.com/shared_res/mos/free_html/us/b2b/momento-
touchless/momento-touchless-features.pdf



**Source:**

https://www.nespresso.com/ecom/medias/sys_master/public/14492859826206/Nespresso-Momento-Coffee-Milk-Contactless-Usage-Instructions.pdf



**Source:** https://www.youtube.com/watch?v=tx0GIBKtjJ8  (00:15 Mins)



**Source:**

https://www.nespresso.com/ecom/medias/sys_master/public/13883831418910/Nespresso-Momento-Touchless-OR-Code-Mobile-Brewing.pdf

34.     The method practiced using the accused products further comprises the step of, in response to receiving the request for a service at the Master unit, automatically associating, at the Master unit, the request for a service to a Service Provider unit associated with the Master unit and corresponding to the request for a service.

35.     For example, the Nespresso Momento 100 Coffee Machine ("Master Unit") uses a dispenser (with a capacity of 400 capsules and 4 varieties of coffee) ("Service Provider Unit") for selection of different coffee types and flavors offered by the machine.  The capsules and the varieties of coffee can be placed inside the dispenser slots of the Momento 100 Coffee Machine. A user can wirelessly select ("request") a type of coffee from the available options ("service"), such as an Espresso, Americano, Cappuccino, etc., using the web application interface on their smartphone.  The dispenser provides the user with the selected coffee drink. Accordingly, the user's request for a particular type of coffee is automatically associated to the dispenser corresponding to the requested drink or beverage.

14



**Source:** https://www.nespresso.com/pro/kr/en/nespresso-momento-all-in-one-solution



**Source:** https://www.youtube.com/watch?v=VlOBsdPI-KI (0:43 min)



**Source:** https://www.youtube.com/watch?v=tx0GIBKtjJ8  (00:15 Mins)



**Source:**

https://www.nespresso.com/ecom/medias/sys_master/public/13883831418910/Nespresso-Momento-Touchless-OR-Code-Mobile-Brewing.pdf



Select "Fill complete box" on the screen.

**Source:** https://www.youtube.com/watch?v=VlOBsdPI-KI (0:47 Min)

36.     The method practiced using the accused products further comprises the step of, in response to receiving the request for a service at the Master unit, automatically establishing at the Master unit, over the wireless bi-directional communications connection, an application interface associated to driver software of the external Client unit.

37.     For example, the Nespresso Momento 100 Coffee Machine can display a QR code.  When a user scans that QR code, a wireless connection is automatically established between the Momento 100 Coffee Machine and the user's smartphone via the internet.  Once connected, the interface of the Momento 100 Coffee Machine is displayed on the user's smartphone as a web application interface.  The web interface displays different types of coffee available at the machine.  The user can wirelessly select a type of coffee from the available options, such as an Espresso, Americano, Cappuccino, etc., using the web application interface on the smartphone.  The web application interface can then display a confirmation message on the user's smartphone.  The web application interface is associated with a particular browser software (e.g., Google Chrome App version).



**Source:** https://www.nespresso.com/shared_res/mos/free_html/us/b2b/momento-touchless/momento-touchless-features.pdf



**Source:** https://www.nespresso.com/ecom/medias/sys_master/public/14492859826206/Nespresso-Momento-Coffee-Milk-Contactless-Usage-Instructions.pdf



**Source:** https://www.youtube.com/watch?v=tx0GIBKtjJ8  (00:15 Mins)



**Source:** https://www.youtube.com/watch?v=tx0GIBKtjJ8  (0:16 Min)

38.    The Nespresso Momento 100 Coffee Machine includes a QR code that is

displayed on the machine.  The QR code is linked to a web application.  When a user scans the

QR code, the user is directed to web application interface (HTTP website), which uses HTTP-

based APIs (Application Programming Interface) to allow the user's smartphone to communicate

with the machine.  The APIs include a request/response model, wherein the user's smartphone can request a service (e.g., select a type of coffee drink) and in response, an identifier representing the requested service is provided to the user's smartphone.

39.   These HTTP-based APIs (web application interface) function at an application layer.  HTTP request headers include a User Agent header, which allows a server to identify the application, operating system, vendor, and/or version of the requesting user agent (e.g., the user's smartphone).  Accordingly, an application interface that is associated to driver software of the user's smartphone is established.

---

**QR code, type "URL" (link to a website)**

This QR content type is probably the most used one. The QR code just contains the address of a website. By scanning the code, the website can be access by the user without the hassle of manually entering the address (URL). This works because the QR reader recognizes the http(s):// protocol prefix and then interprets the text as a website address / URL.

---

**Source:** https://goqr.me/qr-codes/type-qr-url.html#:~:text=The%20QR%20code%20just%20contains,as%20a%20website%20address%20%2F%20URL

---

When you visit a webpage, your browser sends the user-agent string to the server hosting the site that you are visiting. This string indicates which browser you are using, the version number, and details about your system, such as operating system and version.

---

**Source:** https://support.solarwinds.com/SuccessCenter/s/article/SAM-HTTP-HTTPS-Monitor-user agent?language=en_US

---

Starting today, you can build bidirectional communication applications using WebSocket APIs in Amazon API Gateway without having to provision and manage any servers.

HTTP-based APIs use a request/response model with a client sending a request to a service and the service responding synchronously back to the client. WebSocket-based APIs are bidirectional in nature. This means that a client can send messages to a service and services can independently send messages to its clients.

---

**Source:** https://aws.amazon.com/blogs/compute/announcing-websocket-apis-in-amazon-api-gateway/

HTTP headers ❯ User-Agent

# User-Agent

The **User-Agent** request header is a characteristic string that lets servers and network peers identify the application, operating system, vendor, and/or version of the requesting user agent.

**Source:** https://developer.mozilla.org/en-US/docs/Web/HTTP/Headers/User-Agent

A device driver is a piece of software that allows your computer's operating system to communicate with a hardware device the driver is written for. Generally, a driver communicates with the device through the **computer bus**, which connects the device with the computer. Device Drivers depend upon the Operating System's instruction to access the device and performing any particular action. After the action, they also show their reactions by delivering output or message from the hardware device to the Operating system.

**Source:** https://www.javatpoint.com/device-driver-in-operating-system



Device drivers work within the **kernel** layer of the operating system. The kernel is the part of the operating system that directly interacts with the system's physical structure. Instead of accessing a device directly, an operating system loads the device drivers and calls the specific functions in the driver software to execute specific tasks on the device. Each driver contains the device-specific codes required to carry out the actions on the device.

**Source:** https://www.javatpoint.com/device-driver-in-operating-system

40.     The method practiced using the accused products further comprises the step of, in response to receiving the request for a service at the Master unit, automatically transmitting from the Master unit to the external Client unit a service object of the Service Provider unit using the application interface over the wireless bi-directional communications connection.

41.     For example, the Nespresso Momento 100 Coffee Machine can display a QR code.  When a user scans that QR code, a wireless connection is automatically established between the Momento 100 Coffee Machine and the user's smartphone. Once connected, the interface of the Momento 100 Coffee Machine is displayed on the user's smartphone as a web application interface.  The Momento 100 Coffee Machine web interface (HTTP website) uses HTTP-based APIs (Application Programming Interface) to allow the user's smartphone to communicate with the machine.  When a user selects or requests a particular type of coffee drink, the web application sends the request (e.g., using a GET request method).  As one example, when a user requests an Espresso drink, the Momento 100 coffee Machine responds to the user web application on the smartphone with a service object (e.g., an E-Tag), identifying an Espresso as the particular drink to be served by the dispenser ("Service Provider Unit") associated with the Momento 100 Coffee Machine ("Master Unit").



**Source:** https://www.nespresso.com/shared_res/mos/free_html/us/b2b/momento-touchless/momento-touchless-features.pdf



**Source:** https://www.nespresso.com/ecom/medias/sys_master/public/14492859826206/Nespresso-Momento-Coffee-Milk-Contactless-Usage-Instructions.pdf



**Source:** https://www.youtube.com/watch?v=tx0GIBKtjJ8  (00:15 Mins)



**Source:** https://www.sciencedirect.com/science/article/abs/pii/S0167739X16304757

Starting today, you can build bidirectional communication applications using WebSocket APIs in Amazon API Gateway without having to provision and manage any servers.

HTTP-based APIs use a request/response model with a client sending a request to a service and the service responding synchronously back to the client. WebSocket-based APIs are bidirectional in nature. This means that a client can send messages to a service and services can independently send messages to its clients.

**Source:** https://aws.amazon.com/blogs/compute/announcing-websocket-apis-in-amazon-api-gateway/

## Request methods

HTTP defines a set of request methods indicating the desired action to be performed upon a resource. Although they can also be nouns, these requests methods are sometimes referred as HTTP verbs. The most common requests are `GET` and `POST`:

- The `GET` method requests a data representation of the specified resource. Requests using `GET` should only retrieve data.
- The `POST` method sends data to a server so it may change its state. This is the method often used for HTML Forms.

**Source:** https://developer.mozilla.org/en-US/docs/Web/HTTP/Session

## Structure of a server response

After the connected agent has sent its request, the web server processes it, and ultimately returns a response. Similar to a client request, a server response is formed of text directives, separated by CRLF, though divided into three blocks:

1. The first line, the *status line*, consists of an acknowledgment of the HTTP version used, followed by a response status code (and its brief meaning in human-readable text).
2. Subsequent lines represent specific HTTP headers, giving the client information about the data sent (for example, type, data size, compression algorithm used, hints about caching). Similarly to the block of HTTP headers for a client request, these HTTP headers form a block ending with an empty line.
3. The final block is a data block, which contains the optional data.

**Source:** https://developer.mozilla.org/en-US/docs/Web/HTTP/Session

Successful web page response:

```
HTTP/1.1 200 OK
Content-Type: text/html; charset=utf-8
Content-Length: 55743
Connection: keep-alive
Cache-Control: s-maxage=300, public, max-age=0
Content-Language: en-US
Date: Thu, 06 Dec 2018 17:37:18 GMT
ETag: "2e77ad1dc6ab0b53a2996dfd4653c1c3"
Server: meinheld/0.6.1
Strict-Transport-Security: max-age=63072000
X-Content-Type-Options: nosniff
X-Frame-Options: DENY
X-XSS-Protection: 1; mode=block
Vary: Accept-Encoding,Cookie
Age: 7

<!DOCTYPE html>
<html lang="en">
<head>
  <meta charset="utf-8">
  <title>A simple webpage</title>
```

**Source:** https://developer.mozilla.org/en-US/docs/Web/HTTP/Session

# ETag

The **ETag** (or **entity tag**) HTTP response header is an identifier for a specific version of a resource. It lets caches be more efficient and save bandwidth, as a web server does not need to resend a full response if the content was not changed. Additionally, etags help to prevent simultaneous updates of a resource from overwriting each other ("mid-air collisions").

**Source:** https://developer.mozilla.org/en-US/docs/Web/HTTP/Headers/ETag

**Source:**

https://www.nespresso.com/ecom/medias/sys_master/public/13652745584670/Momento-100-EN-AU-S.pdf (Page 34)

42.     Nestlé has had knowledge of the '885 Patent at least as of the date when it was notified of the filing of this action, and as early as February 2, 2022, when it received a letter notifying it of the '885 Patent.

43.     Buffalo Patents has been damaged as a result of the infringing conduct by Nestlé alleged above.  Thus, Nestlé is liable to Buffalo Patents in an amount that adequately compensates it for such infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

44.     Buffalo Patents has neither made nor sold unmarked articles that practice the '885 Patent, and is entitled to collect pre-filing damages for the full period allowed by law for infringement of the '885 Patent.

## ADDITIONAL ALLEGATIONS REGARDING INFRINGEMENT AND PERSONAL JURISDICTION

45.     Nestlé has also indirectly infringed the '885 Patent by inducing others to directly infringe the '885 Patent.

46.     Nestlé has induced the end users and/or Nestlé's customers to directly infringe (literally and/or under the doctrine of equivalents) the '885 Patent by using the accused products.

27

47.     Nestlé took active steps, directly and/or through contractual relationships with others, with the specific intent to cause them to use the accused products in a manner that infringes one or more claims of the '885 Patent, including, for example, Claim 14 of the '885 Patent.

48.     Such steps by Nestlé included, among other things, advising or directing customers, end users, and others (including distributors and equipment services entities) to use the accused products in an infringing manner; advertising and promoting the use of the accused products in an infringing manner; and/or distributing instructions that guide users to use the accused products in an infringing manner.

49.     Nestlé performed these steps, which constitute joint and/or induced infringement, with the knowledge of the '885 Patent and with the knowledge that the induced acts constitute infringement.

50.     Nestlé was and is aware that the normal and customary use of the accused products by Nestlé's customers would infringe the '885 Patent.  Nestlé's inducement is ongoing.

51.     Nestlé has also induced its affiliates, or third-party manufacturers, shippers, distributors, equipment services entities, retailers, or other persons acting on its or its affiliates' behalf, to directly infringe (literally and/or under the doctrine of equivalents) the '885 Patent by importing, selling or offering to sell the accused products.

52.     Nestlé has a significant role in placing the accused products in the stream of commerce with the expectation and knowledge that they will be purchased by consumers in Texas and elsewhere in the United States.

53.     Nestlé purposefully directs or controls the making of accused products and their shipment to the United States, using established distribution channels, for sale in Texas and elsewhere within the United States.

54.     Nestlé purposefully directs or controls the sale of the accused products into established United States distribution channels, including sales to nationwide retailers and wholesalers (including through coffee dispensing machines).  Nestlé's established United States distribution channels include one or more United States based affiliates and third-parties working on behalf of Nestlé.

55.     Nestlé purposefully directs or controls the sale of the accused products online and in nationwide retailers and wholesalers (including through coffee dispensing machines), including for sale in Texas and elsewhere in the United States, and expects and intends that the accused products will be so sold.

56.     Nestlé purposefully places the accused products—whether by itself or through subsidiaries, affiliates, or third parties—into an international supply chain, knowing that the accused products will be sold in the United States, including Texas.  Therefore, Nestlé also facilitates the sale of the accused products in Texas.

57.     Nestlé took active steps, directly and/or through contractual relationships with others, with the specific intent to cause such persons to import, sell, or offer to sell the accused products in a manner that infringes one or more claims of the '885 Patent.

58.     Such steps by Nestlé included, among other things, making or selling the accused products outside of the United States for importation into or sale in the United States, or knowing that such importation or sale would occur; and directing, facilitating, or influencing its affiliates, or third-party manufacturers, shippers, distributors, retailers, equipment servicers, or other

persons acting on its or its affiliates' behalf, to import, sell, or offer to sell the accused products in an infringing manner.

59.     Nestlé performed these steps, which constitute induced infringement, with the knowledge of the '885 Patent, and with the knowledge that the induced acts would constitute infringement.

60.     Nestlé performed such steps in order to profit from the eventual sale of the accused products in the United States.

61.     Nestlé's inducement is ongoing.

62.     Nestlé has also indirectly infringed by contributing to the infringement of the '885 Patent.  Nestlé has contributed to the direct infringement of the '885 Patent by the end user of the accused products.

63.     The accused products have special features that are specially designed to be used in an infringing way and that have no substantial uses other than ones that infringe the '885 Patent, including, for example, Claim 14 of the '885 Patent.

64.     The special features include, for example, hardware and/or software components especially adapted for connecting a mobile device to a dispensing machine and automatically associating a request from the mobile device with a service provider unit, establishing an application interface on the mobile device, and transmitting a service object using the application interface on the mobile device, used in a manner that infringes the '885 Patent.

65.     These special features constitute a material part of the invention of one or more of the claims of the '885 Patent, and are not staple articles of commerce suitable for substantial non-infringing use.

66.     Nestlé's contributory infringement is ongoing.

67.     Nestlé has had actual knowledge of the '885 Patent at least as of the date when it was notified of the filing of this action, and as early as February 2, 2022, when Nestlé received a letter notifying it of the '885 Patent.  Since at least that time, Nestlé has known the scope of the claims of the '885 Patent, the products that practice the '885 Patent, and that Buffalo Patents is the owner of the '885 Patent.

68.     By the time of trial, Nestlé will have known and intended (since receiving such notice) that its continued actions would infringe and actively induce and contribute to the infringement of one or more claims of the '885 Patent.

69.     Nestlé's customers have infringed the '885 Patent.  Nestlé encouraged its customers' infringement.

70.     Nestlé's direct and indirect infringement of the '885 Patent has been, and/or continues to be willful, intentional, deliberate, and/or in conscious disregard of Buffalo Patents' rights under the patent-in-suit.

71.     Buffalo Patents has been damaged as a result of Nestlé's infringing conduct alleged above.  Thus, Nestlé is liable to Buffalo Patents in an amount that adequately compensates it for such infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## JURY DEMAND

Buffalo Patents hereby requests a trial by jury on all issues so triable by right.

## PRAYER FOR RELIEF

Buffalo Patents requests that the Court find in its favor and against Nestlé, and that the Court grant Buffalo Patents the following relief:

a.     Judgment that one or more claims of the '885 Patent have been infringed, either literally and/or under the doctrine of equivalents, by Nestlé and/or all others acting in concert

therewith;

b.      A permanent injunction enjoining Nestlé and its officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in concert therewith from infringement of the '885 Patent; or, in the alternative, an award of a reasonable ongoing royalty for future infringement of the '885 Patent by such entities;

c.      Judgment that Nestlé account for and pay to Buffalo Patents all damages to and costs incurred by Buffalo Patents because of Nestlé's infringing activities and other conduct complained of herein, including an award of all increased damages to which Buffalo Patents is entitled under 35 U.S.C. § 284;

d.      That Buffalo Patents be granted pre-judgment and post-judgment interest on the damages caused by Nestlé's infringing activities and other conduct complained of herein;

e.      That this Court declare this an exceptional case and award Buffalo Patents its reasonable attorney's fees and costs in accordance with 35 U.S.C. § 285; and

f.      That Buffalo Patents be granted such other and further relief as the Court may deem just and proper under the circumstances.

Dated: June 13, 2022                    Respectfully submitted,

                                        */s/ Zachariah S. Harrington*
                                        Matthew J. Antonelli
                                        Texas Bar No. 24068432
                                        matt@ahtlawfirm.com
                                        Zachariah S. Harrington
                                        Texas Bar No. 24057886
                                        zac@ahtlawfirm.com
                                        Larry D. Thompson, Jr.
                                        Texas Bar No. 24051428
                                        larry@ahtlawfirm.com
                                        Christopher Ryan Pinckney
                                        Texas Bar No. 24067819
                                        ryan@ahtlawfirm.com
                                        Rehan M. Safiullah
                                        Texas Bar No. 24066017
                                        rehan@ahtlawfirm.com

                                        ANTONELLI, HARRINGTON
                                        & THOMPSON LLP
                                        4306 Yoakum Blvd., Ste. 450
                                        Houston, TX 77006
                                        (713) 581-3000

                                        *Attorneys for Buffalo Patents, LLC*